ORIGINAL

FLORENCE T. NAKAKUNI #2286
United States Attorney
District of Hawaii

LAWRENCE L. TONG, #3040
Chief, Fraud & Financial
Crimes Section

KENNETH M. SORENSON
Deputy Chief, Fraud & Financial
Crimes Section
AMALIA FENTON
Assistant United States Attorneys
Room 6-100, PJKK Federal Building
300 Ala Moana Boulevard
Honolulu, Hawaii   96850
Telephone:  (808) 541-2850
Facsimile:  (808) 541-2958
Email:   Ken.Sorenson@usdoj.gov
         Amalia.Fenton@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

DEC 07 2016

at 3 o'clock and 55 min. P.M
SUE BEITIA, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA | CR. NO. **CR 16-00786 LEK** |
| Plaintiff, | **INFORMATION** |
| v. | Count 1    18 U.S.C. § 371 |
| BU YOUNG KIM          (01) a/k/a: "Pretty Sister" | |
| CHAN HUI CHO          (02) | |
| Defendants. | |

<u>**INFORMATION**</u>

**INFORMATION**

The United States Attorney charges:

**INTRODUCTORY ALLEGATIONS**

At all times material to this Information,

1.    The Food and Drug Administration ("FDA") was the agency of the United States responsible for regulating the manufacture, labeling, and distribution of drugs in the United States.  Among other things, the FDA was responsible for enforcing the provisions of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq*. ("FDCA"), including regulating the distribution of prescription drugs.

2.    A "drug" was defined by the FDCA as, among other things, any article intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; articles (other than food) intended to affect the structure or any function of the body of man or other animals; and articles intended for use as a component of any such articles.  *See* 21 U.S.C. § 321(g).

3.    A prescription drug was defined by the FDCA as "a drug intended for use by man which because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, is not safe except under the supervision of a practitioner licensed by law to

2

administer such drug." 21 U.S.C. § 353(b)(1)(A). A drug may also be limited to prescription use by its FDA-approved application. *See* 21 U.S.C. § 353(b)(1)(B).

4. FDA is responsible for regulating the manufacture, labeling, dispensing and distribution of all drugs shipped or received in interstate or foreign commerce, including the dispensing of prescription drugs. FDA's responsibilities include enforcing the FDCA's requirements that drugs bear labels and labeling that enable health care providers and consumers to use them in a safe manner and that the drugs are listed by and manufactured in facilities registered with the Secretary of the United States Department of Health and Human Services. 21 U.S.C. §§ 352(f), 352(o), 360(c), and 360(i).

5. The FDCA establishes that a drug is deemed to be "misbranded" if it does not meet certain requirements of the statute, including if its labeling fails to bear adequate directions for use, 21 U.S.C. § 352(f), if information required to appear on the label is not in the English language (unless distributed solely in Puerto Rico or certain U.S. territories), 21 U.S.C. § 352(c), 21 C.F.R. § 201.15(c)(1), or if a drug came from a foreign drug establishment and the drug was not annually listed with the FDA by that establishment as one of the drugs which was being manufactured for commercial distribution in the United States, 21 U.S.C. §§ 352(o), 360(j).

3

6.    The FDCA prohibits the commission of any act, after shipment in interstate commerce and while a drug is held for sale, which results in the drug becoming misbranded.  21 U.S.C. §§ 331(k), 353(b)(1)(B). In the case of a prescription drug, a drug is misbranded if it is dispensed by a person or practitioner not licensed by law to administer the drug, or its label fails to bear the symbol "Rx only".  21 U.S.C. §§ 353(b)(1) and (b)(4)(A); 21 C.F.R. § 201.100(b)(1).

7.    The State of Hawaii Department of Commercial and Consumer Affairs (DCCA) regulates the practice of medicine and the dispensing and administration of prescription drugs in Hawaii.  Hawaii state law requires persons and practitioners who perform medical procedures and who dispense prescription drugs to undergo formal educational training, and to be a licensed practitioner.  Haw. Rev. Stat. §§ 453-1, 453-2, 453-4, 461-1. At all times material to this Information, neither BU YOUNG KIM nor CHAN HUI CHO were licensed medical practitioners in the State of Hawaii, nor were either licensed to prescribe prescription drugs.

4

## COUNT 1
### (18 U.S.C. §371)
## (Conspiracy to Dispense Prescription Drugs by a Non-Licensed Practitioner; to Import Misbranded Drugs Contrary to Law; and Smuggle Bulk Cash)

8. Paragraphs 1 through 7 of the Introductory Allegations are re-alleged and incorporated by reference as though fully set forth herein.

### The Conspiracy and Its Objects

9. From On or about between January 1, 2014 and continuing to on or about April 1, 2016, in the District of Hawaii and elsewhere, the Defendants, BU YOUNG KIM and CHAN HUI CHO, knowingly conspired and agreed with each other and with persons known and unknown to the grand jury, to commit offenses against the United States, that is to:

a. Knowingly and fraudulently dispense prescription drugs in the State of Hawaii without being licensed by the state to do so, while such prescription drugs were held for sale and after their shipment in interstate commerce, in violation of 21 U.S.C. §§ 331(k), 353(b)(1) and 333 (a)(2).

b. Knowingly import merchandise, to wit, misbranded drugs, contrary to law in violation of 18 U.S.C. § 545 and 21 U.S.C. § 331(a), and to

c. Knowingly and willfully, with the intent to evade a currency reporting requirement under Title 31, United States Code, Section 5316, conceal more than $10,000 in U.S. currency

5

and to transport and transfer such currency from a place within the United States to a place outside of the United States, in violation of 31 U.S.C. § 5332(a)(1).

In furtherance of the conspiracy, BU YOUNG KIM and CHAN HUI CHO, and others known and unknown, employed the following manner and means:

## MANNER AND MEANS OF THE CONSPIRACY

10.  It was a part of the conspiracy that BU YOUNG KIM and CHAN HUI CHO would travel to the Republic of Korea for the purpose of obtaining prescription drugs with the intent of administering them to person in Hawaii and elsewhere for cosmetic purposes and to minimize the appearance of wrinkles and other signs of aging.

11.  Upon acquiring prescription drugs from sources in Korea, BU YOUNG KIM would administer and dispense such products in the United States, including in the State of Hawaii, to individuals seeking facial cosmetic and "filler" type treatments and procedures, along with other facial, appearance and health enhancement benefits.  The products containing active pharmaceutical ingredients requiring a prescription included:

    a. Dysport, a prescription drug administered by injection for cosmetic improvement similar to "Botox" containing botulinum neurotoxin type A;

    b. Lidocaine, a numbing agent;

6

c. Liporase Injectible Hyaluronidase, an injectable
   spreading substance used to encourage the dispersion and
   absorption of fillers;

d. Substances containing betamethasone, a corticosteroid
   used to alleviate inflammation and treat severe skin
   conditions;

e. Substances containing dexamethasone, another
   corticosteroid; and

f. Substances containing triamcinolone acetonide, another
   topical and injectable corticosteroid.

12.   It was the practice of BU YOUNG KIM and CHAN HUI CHO
to fly into Hawaii either in possession of the prescription
drugs they intended to administer, or to cause them to be
shipped from the Republic of Korea to Hawaii prior to their
arrival.  On at least one occasion, when transporting misbranded
prescription drugs in her carry-on luggage on an international
flight from Korea, BU YONG KIM failed to declare to U.S. Customs
and Border Protection inspectors at JFK International Airport in
New York that she was carrying commercial merchandise (i.e.,
prescription drugs) intended for sale in the United States.

13.   Once BU YOUNG KIM and CHAN HUI CHO arrived in Hawaii,
BU YOUNG KIM would administer injections of substances
containing active pharmaceutical ingredients requiring a
prescription, such as Dysport, in rented hotel rooms, the
residences of associates, or cooperating business locations.

7

14. It was the practice of BU YOUNG KIM to charge recipients of the unlicensed dispensing of prescription drugs $100 to $500 dollars in U.S. currency.

15. When BU YOUNG KIM was administering prescription drugs to consumers, neither BU YOUNG KIM nor CHAN HUI CHO provided any warning indications, or any warning materials, setting forth the risk factors when using the above prescription drugs. Nor did BU YOUNG KIM or CHAN HUI CHO disclose to consumers that BU YOUNG KIM was administering and dispensing prescription drugs that only a licensed practitioner could administer and dispense.

16. The prescription drugs and other drugs imported into the United States by BU YOUNG KIM and CHAN HUI CHO failed to exhibit proper labeling because they (1) failed to present adequate directions for use and adequate warnings, (2) failed to have labeling in the English language; (3) were not annually listed with the FDA as one of the drugs which was being manufactured for commercial distribution in the United States; and (3) were prescription drugs, yet failed to display the mandatory cautionary symbol: "Rx Only" as required by United States law. None of the prescription drugs brought into the United States and administered by BU YOUNG KIM were accompanied with adequate directions for use, dosage and administration. None of the prescription drugs were accompanied with listings of

adverse reactions, drug interactions, general prescribing information, contraindications, warnings or precautions for use.

17.   It was a further part of the conspiracy that BU YOUNG KIM would arrange for the transport of the above listed prescription drugs, either through commercial carrier or courier, into the United States from Korea.  From time to time, CHAN HUI CHO would receive such shipments via commercial carrier at his business in New York, as well as at other locations.

18.   It was a further part of the conspiracy that BU YOUNG KIM would arrange for individuals to receive commercial carrier shipments of the above listed prescription drugs at their businesses or residences in Honolulu, Hawaii.

19.   It was a further part of the conspiracy that BU YOUNG KIM would arrange through intermediaries medical or treatment sessions wherein BU YOUNG KIM would administer the misbranded prescription drugs by injection via hypodermic needle into the facial areas of individuals who were seeking the benefits of facial fillers and "Botox" like substances.  At no time did BU YOUNG KIM warn or advise individuals seeking treatment with her that she was not a licensed medical practitioner or licensed pharmacist, nor did she tell individuals that she had no formal education or training in medicine or pharmacology.

20.   It was a further part of the conspiracy that neither BU YOUNG KIM nor CHAN HUI CHO sought to become licensed

9

practitioners by following the educational, training, testing and licensing protocols to be licensed medical practitioners or pharmacists in the State of Hawaii.  It was a part of the conspiracy that BU YOUNG KIM and CHAN HUI CHO would circumvent state statutory and regulatory requirements enacted to protect the public health by regulating the practice of medicine and pharmacology.  It was a part of the conspiracy that by operating their illicit cosmetic medical enterprise in this fashion, BU YOUNG KIM and CHAN HUI CHO were able to gain a competitive advantage over medically licensed professionals and pharmacists who had undertaken years of educational, training, testing, licensing and registration processes in order to treat patients safely in accordance with the law.  As such, BU YOUNG KIM and CHAN HUI CHO were able to operate a commercial medical and prescription dispensing enterprise free of the educational and licensing requirements of state egulation, and free of the state excise taxing obligations required of lawfully conducted businesses.

21. It was a further part of the conspiracy that BU YOUNG KIM and CHAN HUI CHO would transport United States currency in amounts greater than $10,000 out of the United States without declaring that fact on United States Customs and Border Protection Form 6059B, as required by United States law.

## OVERT ACTS

In furtherance of the conspiracy, and to effect the objects thereof, BU YOUNG KIM and CHAN HUI CHO committed various overt act, including, but not limited to the following:

22. At a precise time unknown, but on or about between January 1, 2014 and March 24, 2016, BU YOUNG KIM and CHAN HUI CHO transported, or caused to be transported, into the United States, from the Republic of Korea, misbranded prescription drugs.

23. In March 2015, at a precise time unknown, BU YOUNG KIM received a shipment of misbranded drugs in Hawaii and subsequently used them to administer to clients seeking facial improvement treatments through injection.

24. On or about August 19, 2015, BU YOUNG KIM contacted an individual in Hawaii and asked the individual to receive a package for BU YOUNG KIM which was to contain facial treatments, including injectable drugs.

25. On or about August 23, 2015, BU YOUNG KIM shipped, or caused to be shipped, from the Republic of Korea to an address in Honolulu, Hawaii, misbranded prescription drugs.

26. On or about mid-September 2015, BU YOUNG KIM caused to be shipped, from the Republic of Korea to the same address in Honolulu, Hawaii, another package containing prescription drugs that failed to provide warning indications and failed to display

11

the cautionary symbol "Rx Only."  The shipping label on the package failed to declare all of the drugs and products contained in the shipment.

27.  In or around August and September of 2015, packages with the same cargo and commodity descriptions were sent from the Republic of Korea to CHAN HUI CHO at his business located at 4724 Church Avenue, Brooklyn, New York.

28.  On or about November 12, 2015, BU YOUNG KIM traveled to Honolulu, Hawaii for the purpose of administering medical cosmetic treatments and dispensing prescription drugs.

29.  On or about November 12, 2015 to November 19, 2015, CHAN HUI CHO rented room 354 of the Pagoda Hotel in Honolulu, Hawaii.

30.  On or about November 18, 2015, BU YOUNG KIM administered medical cosmetic treatments and dispensed prescription drugs to clients in room 354 of the Pagoda Hotel in Honolulu, Hawaii.

31.  On or about December 4, 2015, BU YOUNG KIM traveled to the Republic of Korea.

32.  On or about January 7, 2016, BU YOUNG KIM arrived at JFK International Airport in New York in possession of misbranded prescription drugs.

33.  On or about March 1, 2016, BU YOUNG KIM and CHAN HUI CHO traveled to Honolulu, Hawaii.

34.   On or about March 6, 2016, BU YOUNG KIM and CHAN HUI CHO attempted to board a flight in Honolulu, Hawaii bound for the Republic of Korea.   CHAN HUI CHO declared on the required Customs and Border Protection Form, CBP Form 6059-B, that he and BU YOUNG KIM were not carrying more than $10,000 in United States currency.   When questioned by U.S. Customs, Border Protection officers, BU YOUNG KIM and CHAN HUI CHO told officers they were carrying $9,000 in currency when in fact they were carrying $79,986.

35.   On March 24, 2016, BU YOUNG KIM administered Dysport injections to patients and clients at a condominium project in Honolulu, Hawaii.   CHAN HUI CHO was also present in the apartment unit.   At this time, BU YOUNG KIM and CHAN HUI CHO were in possession of hundreds of vials of prescription drugs that could only be legally administered by a licensed practitioner and which required a prescription to dispense, including Dysport, Lidocaine, Liporase Injectible Hyaluronidase, and other substances.

36.   On April 1, 2016, BU YOUNG KIM and CHAN HUI CHO were found to possess, at their residence in Whitestone, New York, hundreds of vials of mislabeled injectable prescription drugs, including Lidocaine, substances containing betamethasone, substances containing dexamethasone, and substances containing triamcinolone acetonide, that failed to show the cautionary

13

symbol "Rx Only", and that they had acquired at some time prior

to March 24, 2016.  At this time, BU YOUNG KIM and CHAN HUI CHO

were found to also be in possession of $86,461.00 in U.S.

currency.

　　　　All in violation of Title 18, United States Code, Section

371.

　　　　　　　　DATED:  December  7 , 2016, at Honolulu, Hawaii.


FLORENCE T. NAKAKUNI
United States Attorney
District of Hawaii


_____
LAWRENCE L. TONG
Chief, Fraud & Financial
Crimes Section


_____
KENNETH M. SORENSON
Deputy Chief, Fraud & Financial
Crimes Section
Assistant United States Attorney


_____
AMALIA FENTON
Assistant United States Attorney




United States v. Bu Young Kim and Chan Hui Cho
"Information"
Cr. No. _____